# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3109

_____

United States of America

*Plaintiff - Appellee*

v.

Michael B. Lowry

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 18, 2019
Filed: August 30, 2019

_____

Before SMITH, Chief Judge, KELLY and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Michael Lowry entered a conditional guilty plea to being a felon in possession
of a firearm violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He appeals, arguing

that the district court[1] erred in denying his motion to suppress evidence recovered from a stop not supported by reasonable suspicion. Although we agree that the officer who stopped Lowry lacked reasonable suspicion, suppression of the evidence is inappropriate under the attenuation doctrine. We therefore affirm.

I.

On a cold and windy January night, Michael Lowry was waiting at a bus stop near U.S. Highway 40 and I-70 in Independence, Missouri. The bus stop had two shelters, separated by about 25 yards, and was located in a high crime area. Lowry was wearing heavy clothes and seated inside one of the two shelters. Tyson Parks was inside the other shelter. Law enforcement had previously banned Parks from the bus stop.

Shortly after 9 p.m., Officer Joseph Thomas Hand of the Independence Police Department (Independence) arrived at the bus stop on a routine patrol. Independence proactively patrolled the bus stop and Officer Hand tried to visit it five or six times a night. He was accompanied by a ride-along officer from another police department who was in the process of being hired by Independence. The ride-along officer had not been deputized and therefore could not assist Officer Hand with any police activities. Officer Hand was responsible for the ride-along officer's safety.

Officer Hand immediately noticed Parks and approached him. He later admitted that he was frustrated because he knew that Parks was banned from the bus stop and he had previously found Parks intoxicated and causing disturbances there. As he approached, he yelled that Parks needed to leave. At the same time, he noticed

---

[1] The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, adopting the report and recommendations of the Honorable Matt J. Whitworth, United States Chief Magistrate Judge for the Western District of Missouri.

Lowry looking in his direction and then getting up to walk behind the other shelter, out of his sight. Lowry remained behind the shelter a short time and then returned to the front side, while Officer Hand was still talking with Parks. He remained there until Officer Hand looked in his direction again and they made eye contact. When Lowry turned away and started to walk behind the shelter for a second time, Officer Hand shined his flashlight on him and ordered him to come over. Normally, Officer Hand testified, he would have approached Lowry and talked with him, but because he had a ride-along in his car and was busy with Parks in the other shelter he directed Lowry to come to him.

Officer Hand testified that he suspected Lowry was engaged in some sort of criminal activity and might have been hiding weapons, drugs or alcohol. He also believed that Lowry was attempting to avoid contact. Lowry's bulky clothing, his backpack, and his presence at a bus stop in a high crime area amplified Officer Hand's suspicions.

Lowry obeyed the directive and Officer Hand asked him to provide identification, which he also did. Lowry then waited by the patrol car while Officer Hand ran a warrant check. The warrant check revealed outstanding warrants and warned that Lowry was known to be violent. Officer Hand approached Lowry and asked him to place his hands behind his back, at which point Lowry informed Officer Hand that he had a gun in his waistband, a clip in his back pocket, and a collapsible baton in his backpack. He also told Officer Hand that he was a convicted felon. Officer Hand placed him under arrest and searched him, recovering the gun, the clip, and the baton.

Lowry was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He filed a motion to suppress the evidence as the fruit of an unlawful stop. The motion, including whether or not the attenuation doctrine should apply to prevent suppression, was briefed and a hearing was

conducted before the magistrate. At the hearing, Lowry's attorney cross-examined Officer Hand.

The magistrate recommended that the motion be denied because Officer Hand had reasonable suspicion to stop Lowry, and the district court adopted the recommendation. Neither the magistrate nor the district court addressed the attenuation issue. Lowry entered a conditional guilty plea, reserving the right to challenge the suppression decision.

## II.

"A mixed standard of review applies to the denial of a motion to suppress evidence." *United States v. Smith*, 820 F.3d 356, 359 (8th Cir. 2016). "The trial court's findings of fact are reviewed for clear error and its denial of the suppression motion is reviewed *de novo*." *United States v. Ford*, 888 F.3d 922, 925 (8th Cir. 2018).

## A.

The Fourth Amendment prohibits unreasonable searches and seizures. Law enforcement "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The government concedes that such a stop occurred when Officer Hand ordered Lowry to come to him. Therefore, it must prove, "looking at the totality of the circumstances of each case, that the detaining officer had a particularized and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010) (cleaned up) (quoting *United States*

*v. Arvizu*, 534 U.S. 226, 273 (2002)).  Lowry argues that the government cannot make this showing and that the exclusionary rule should therefore prevent the government from using the seized firearm as evidence.

Reasonable suspicion "requires less than probable cause of criminal activity, but the suspicion cannot be based on an 'inarticulate hunch[].'" *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968).  It may be based on, among other things, the "time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence."  *United States v. Quinn*, 812 F.3d 694, 697–98 (8th Cir. 2016) (citation omitted).  But, facts that are "shared by countless, wholly innocent persons" cannot give rise on their own to reasonable suspicion.  *Jones*, 606 F.3d at 967.

Our decision in *Jones* offers a useful comparison to this case.  There, an officer stopped Jones after he drove past twice in his police cruiser and observed Jones staring at him.  *Id.* at 965.  Jones was walking in a high crime area, wearing a hoodie (although it was 68 degrees outside), and clutching his pocket in a way that the officer had been trained to associate with carrying a weapon.  *Id.* at 966.  Finding that the officer lacked reasonable suspicion to initiate a stop, we emphasized that "nowhere in the district court record did the government identify what criminal activity [the officer] suspected" and that "[t]oo many people" could be described as Jones was "to justify a reasonable suspicion of criminal activity" on the basis of that description.  *Id.* at 966–67.

The facts supporting reasonable suspicion are weaker here.  Officer Hand could only offer a vague justification that he suspected Lowry was engaged in some sort of criminal activity and might have been hiding weapons, drugs, or alcohol when he walked behind the bus shelter.  Leaving aside the issue that possessing weapons and alcohol is not necessarily a crime, reasonable suspicion must rest on a "particularized and objective basis," *id.* at 966, and not a "mere 'hunch,'" *Navarette v. California*,

572 U.S. 393, 397 (2014). Officer Hand's equivocal explanation for the stop suggests that this stop was in fact based on a hunch.

The government grounds much of its argument in facts that, like those at issue in *Jones*, are shared by wholly innocent and reasonable persons. People visit bus stops in high crime areas because they need to catch a bus. Everyone wears heavy clothing on winter nights. People tend to watch when a police officer engages in a heated exchange with someone in their vicinity. And there are any number of innocent impulses that might motivate someone in Lowry's situation to walk behind the shelter, including the desire to move around or to steer clear of the tense situation between Parks and Officer Hand.

That Lowry continued to look at Officer Hand when he walked away, a fact that the district court considered significant, does not—without more—transform this innocent behavior into a basis for reasonable suspicion. "Because totality of the circumstances is the test, undue focus on one circumstance is suspect." *Jones*, 606 F.3d at 967. In *United States v. Quinn*, 812 F.3d 694 (8th Cir. 2016), relied on by the government, we found it important that in addition to the fact that "Quinn reacted suspiciously when he noticed [the officer's] presence by 'constantly looking over his shoulder toward [the officer's] direction,'" he also partially matched a description of a suspect and was seen walking near a crime scene when there were few other pedestrians around. 812 F.3d at 698. No similar facts are present here and Lowry's eye contact with the officer is insufficient. We therefore respectfully disagree with the district court and conclude that Officer Hand lacked reasonable suspicion to detain Lowry.

B.

The lack of reasonable suspicion does not resolve the case. The government argues because Officer Hand discovered the evidence against Lowry after he learned

of an outstanding arrest warrant, the initial violation of Lowry's Fourth Amendment rights was sufficiently unrelated to the ultimate discovery of the evidence that suppression is inappropriate.[2] We agree.

At issue is the "attenuation doctrine," an exception to the exclusionary rule that applies "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

We use a three-part test to determine whether the attenuation doctrine applies. "First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider the presence of intervening circumstances. Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct." *Id.* at 2062 (citations omitted).

Much of the dispute here centers on how similar the facts are to those in *Strieff*. There, police officers staked out a suspected drug house, watching individuals visit the house for a few minutes at a time. 136 S. Ct. at 2059. An officer saw Strieff, leaving the house and stopped him, directing him to hand over his identification. *Id.* The officer then relayed the information to a police dispatcher who informed him that Strieff had an outstanding warrant for a traffic violation. *Id.* The officer arrested Strieff and, during a search incident to arrest, discovered drug paraphernalia and methamphetamine on his person. *Id.*

---

[2] Lowry urges us to remand for the district court to consider this question in the first instance. We decline to do so because the argument was presented to the district court and the record has been fully developed. *United States v. Wearing*, 837 F.3d 905, 909 (8th Cir. 2016) ("[W]e may affirm on any basis supported by the record.").

Utah conceded that the officer lacked reasonable suspicion for the stop, but the Supreme Court nonetheless declined to suppress evidence found during the search because the attenuation doctrine applied. *Id.* at 2063. Although it recognized that the first factor, "temporal proximity" favored exclusion, the other two factors both favored finding attenuation. *Id.* at 2062. Regarding the second factor, the Court reasoned that the discovery of the warrant was an "intervening circumstance" because it was "valid, it predated [the officer's] investigation, and it was entirely unconnected with the stop. And once [the officer] discovered the warrant, he had an obligation to arrest Strieff." *Id.* The third factor also favored attenuation because the officer had been "at most negligent" and had made "two good-faith mistakes," so that the misconduct was neither purposeful nor flagrant. *Id.*

This case is similar to *Strieff*. As both sides agree, the first attenuation factor, the temporal proximity of the intervening circumstance to the original violation, favors suppression. However, the second factor, "the presence of intervening circumstances," favors attenuation. As in *Strieff*, once Officer Hand discovered an arrest warrant that pre-existed the stop and was unconnected with it, his arrest of Lowry "was a ministerial act that was independently compelled by the pre-existing warrant," and Officer Hand's search incident to that arrest was lawful. *Id.* at 2063. The third factor, "the purpose and flagrancy of the official misconduct," also favors attenuation. Officer Hand lacked reasonable suspicion to stop Lowry, but "[f]or the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* at 2064. Officer Hand testified that under normal circumstances, he would simply have approached Lowry and spoken with him, leading to a consensual encounter rather than a *Terry* stop. He did not do so here because he was busy managing a tense situation with Parks inside the other bus shelter and had a non-deputized ride-along officer in his car. This may amount to an "error[] in judgment" comparable to that in *Strieff*, but it is not a "flagrant" or "purposeful" violation of the Fourth Amendment. *Id*. at 2063.

Lowry makes several arguments that this case differs from *Strieff*, but we are unpersuaded. First, he argues that the police had a stronger basis for the stop in *Strieff* than Officer Hand had here. However, the Supreme Court made it clear that "[f]or [a] violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* at 2064. The only question is whether there was proper cause, not how close the call was. In that regard, *Strieff* is the same as this case—neither officer had reasonable suspicion. *Id.* at 2064. To the extent that he argues that the lack of reasonable suspicion was so clear that it calls Officer Hand's motivation for stopping him into question, Lowry is still incorrect. Admittedly, there are cases like *Jones* where we have found no reasonable suspicion even though the officer had more to go on than Officer Hand did, but the relative weakness of the government's case here is not so extreme that it gives rise to an inference that Officer Hand acted purposefully to violate Lowry's rights.[3] In fact, Officer Hand's actions are understandable, even if unconstitutional, under the circumstances of the stop. Nothing in the record suggests that Officer Hand *knew* that he lacked reasonable suspicion and flagrantly disregarded that fact.

Lowry also argues that the discovery of the arrest warrant was not actually an "intervening" event because it was, far from being "entirely unconnected with the stop," the actual purpose of the stop. *Id.* at 2062. The dissenting Justices in *Strieff* raised the specter of this argument when they predicted that officers would conduct unlawful stops in the hope of discovering outstanding arrests warrants that would render any evidence found admissible. *See, e.g., id.* at 2073 (Kagan, J. dissenting). But *Strieff* did not announce a *per se* rule that the discovery of a warrant would always vitiate subsequent searches. Whether it is characterized as a part of the second element of the attenuation test (that the intervening event be unconnected to the purpose for the stop) or as a part of the third element of the attenuation test (that the officer not have a flagrant or unconstitutional purpose), *Strieff* instructs that we

---

[3] We described *Jones* as a "close question." 606 F.3d at 967.

should decline to find attenuation where there is evidence that the police officer was engaged in a fishing expedition for old warrants. *Id.* at 2063.

The record does not suggest a fishing expedition. Although Lowry's attorney had the opportunity to cross-examine him, there is nothing to suggest that Officer Hand routinely stopped individuals without reasonable suspicion just to fish for outstanding warrants. In fact, the record reveals Officer Hand did not usually make stops in similar situations. Also, although Independence instructed its officers to visit the bus stop several times a night, there is no evidence that it encouraged officers to conduct dragnet warrant checks while they were there. And as previously discussed, the fact that Officer Hand's suspicion about Lowry was vague does not by itself give rise to the inference that his sole purpose for stopping Lowry was to check for a warrant. That Officer Hand's first action when stopping Lowry was to ask for identification might suggest a fishing expedition as a possibility, but it is not enough on its own to clear the bar set by *Strieff*.

We do not intend to close the door to future challenges, under *Strieff*, to evidence found in stops like this one. *Strieff*, in declining to adopt a *per se* rule, left that door open. But in such a challenge, we require more evidence of flagrancy or of purpose than is present here.

### III.

The discovery of the evidence used against Lowry was attenuated from his unlawful stop and suppression is inappropriate in this case. The judgment of the district court is affirmed.

_____